UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action No.: 4:15-cr-00764-RBH-1 |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Marvin Songlin, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court following an evidentiary hearing regarding a motion to suppress filed by Defendant Marvin Songlin. Having considered the witnesses' testimony and the parties' arguments, the Court denies Defendant's motion.

## Background

A federal grand jury indicted Defendant on charges of conspiracy, wire fraud, mail and other fraud, conspiracy to launder money, possession of marijuana with intent to distribute, and possession of a firearm in furtherance of drug trafficking. ECF No. 67. The Government filed the indictment on November 9, 2015, and on November 30, 2015, Defendant appeared for his arraignment and entered a not guilty plea. ECF Nos. 67 & 81. On August 8, 2016, the Government filed a superseding indictment as to the drug and firearm charges. ECF No. 212.

Defendant filed the instant motion to suppress on June 30, 2016, and the Court held an evidentiary hearing on August 18, 2016, after which it took the matter under advisement. ECF Nos. 186. Three witnesses testified at the evidentiary hearing on Defendant's motion to suppress in the following order: United States Postal Inspector Steven Stebbins, Defendant, and United States Postal Inspector Luther Paul King.

**I.     Inspector Stebbins's Testimony**

Inspector Stebbins testified that shortly after 7:00 AM on October 22, 2015, he, King, and three other law enforcement officers arrived at an apartment in Myrtle Beach, South Carolina, to execute a warrant for Defendant's arrest based on information relating to a Jamaican lottery scam involving mail and wire fraud. The officers parked their vehicles, approached the apartment, knocked on the front door with their weapons drawn, and announced they had an arrest warrant. After approximately three to four minutes, Defendant opened the front door, and the five officers entered the apartment. Defendant was immediately placed in handcuffs with his hands behind his back, and the officers asked him if anyone else was present. He informed them his sister was there, and she was detained while the officers conducted a protective sweep of the entire apartment. The sister went outside the apartment with two officers and was interviewed by them.

Stebbins, King, and one other officer stayed inside the apartment with Defendant and asked him if he wanted to talk about why law enforcement was there. Defendant said yes, so the officers moved the handcuffs to the front of his body and placed him on a couch in the living room.[1] The officers informed him they had a federal arrest warrant and explained the nature of the charges, and Defendant indicated he wanted to talk with them. Before the officers proceeded any further, Defendant signed and executed a U.S. Postal Inspection Service "Warning and Waiver of Rights" form waiving his *Miranda*[2] rights.

Stebbins then informed Defendant that the officers were investigating a Jamaican lottery scam, and that they wanted to ask him questions about certain wire and mail transactions. After interviewing

---

[1] Stebbins explained the handcuffs were moved to the front of Defendant's body because it would have been uncomfortable for Defendant to be handcuffed from behind while seated on the couch.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

Defendant for approximately fifteen to twenty minutes, Stebbins asked Defendant if the officers could search both his residence and his vehicle. According to Stebbins, Defendant gave his verbal consent to the search of both the apartment and vehicle. Stebbins then filled out a U.S. Postal Inspection Service "Consent to Search" form and read it aloud to Defendant.[3] The Consent to Search form contained the following information:

> I, *Marvin Songlin*, have been informed of and understand my constitutional rights not to have a search made of ***my residence, vehicle 402 11th Ave S Apt 2 Myrtle Beach SC*** without the requirement of a search warrant. I have also been informed of, and understand, my right to refuse to consent to the search. However, I hereby authorize U.S. Postal Inspector(s) *Stebbins, King & other LEOs* to conduct a complete search of ***my residence, vehicle*** located at *402 11th Ave S Apt 2 Myrtle Beach SC + Dodge Intrepid GYI-739 SC*
>
> The U.S. Postal Inspector(s) is/are authorized by me to take from the above described property any letters, papers, materials, or other property, which is contraband or evidence and specifically ***evidence of lottery scam, contraband***
>
> I understand that this contraband or evidence may be used against me in court of law or an administrative proceeding.
>
> I understand my right to withdraw my consent at any time.
>
> This written permission is being given by me to the above named persons freely and voluntarily without threats, promises, or coercion of any kind to have me consent to the search and/or sign this form. I realize that I may ask for and receive a receipt for all things taken.

Gov't Exh. 2 (underlined and italicized text indicating blanks filled in with Stebbins's handwriting) (bold emphases added). Defendant signed the bottom of the form as the "Consentor," and Stebbins and King signed their signatures as "Witnesses."

---

[3]     Stebbins testified Defendant did not have any difficulty understanding what Stebbins was saying.

After Defendant signed the consent form, Stebbins and other officers first searched the apartment and then searched Defendant's vehicle. While his apartment was searched, Defendant remained seated on the couch in the living room and never objected to the search. The officers seized a gun and marijuana as a result of the search, as well as some evidence of the lottery scam.

On cross-examination, Stebbins testified that after Defendant signed the "Warning and Waiver of Rights" form (the *Miranda* waiver), he stated he had a firearm. Additionally, Defendant's sister informed officers that Defendant had a firearm and marijuana in the house. Stebbins testified he knew Defendant had a firearm and marijuana before he searched for these items, and testified he filled in the "Consent to Search" form with the word "contraband" (after the words "evidence of lottery scam") to include the firearm and marijuana.

On redirect examination, Stebbins testified it was not his practice to add things (words) to a consent to search form after the suspect executes it, and he testified he did not do so in this case.

On examination by the Court, Stebbins testified the officers found a firearm and some marijuana located in the kitchen in the cabinets above the refrigerator, and additional marijuana and cash located in the bedroom of Defendant's sister. Stebbins stated the search for evidence of the lottery scam included all the rooms of the apartment, and he stated the firearm and marijuana would have been found during the search for evidence of the lottery scam. He further testified the search of the apartment yielded evidence of the identification of some of the victims of the lottery scam.

**II.     Defendant's Testimony**

Defendant disputed several aspects of Stebbins's version of the incident. On direct examination, Defendant testified he was asleep when he heard a knock on the door. After he answered the door, the officers immediately told him he was under arrest, told him to place his hands behind his back, began

searching the apartment, said they had a search warrant signed by a judge, and found a gun underneath the sofa in the living room. The officers took his sister outside, began asking Defendant about the lottery scam, placed him in the back of a police car, and continued searching the apartment. Defendant stated the officers then presented him with the "Consent to Search" form, which only included the word "vehicle" and not the phrase "my residence."[4] Defendant testified he read the entire form and gave officers consent to search the vehicle only after they threatened to lock up his sister.

On cross-examination, however, Defendant testified he was seated on the couch, handcuffed from the front, while the officers searched the apartment and asked him questions about the Jamaican lottery scam.[5] Defendant denied ever telling the officers that there was a gun above the refrigerator or that he sold marijuana. He further claimed $3,800 seized from the pocket of a black jacket in the closet of a bedroom belonged to his sister, as did the bedroom where the money was found. Additionally, Defendant testified he stayed at the apartment but could not give consent to a search of the apartment because it was not his.

Defendant reiterated throughout his entire testimony that he only gave officers consent to search the vehicle, not the apartment.

### III. Inspector King's Testimony

Inspector King testified that he and the other officers conducted a protective sweep of the apartment when they first entered it, and that Defendant's sister was located in her bedroom and escorted outside. King explained that besides the protective sweep for persons in the apartment, no

---

[4] Defendant testified he signed the "Warning and Waiver of Rights" form and the "Consent to Search" form at the same time.

[5] Defendant told officers he was not involved with any lottery scam but said he regularly sent money to his family in Jamaica.

5

search was conducted before Defendant signed the "Consent to Search" form. King further testified he took notes while Stebbins interviewed Defendant in the living room, and he was present when Defendant executed both the "Warning and Waiver of Rights" form and the "Consent to Search" form. King testified the officers never told Defendant they had a search warrant or threatened to arrest his sister. King stated the "Consent to Search" form was read to Defendant before Defendant signed it, that Defendant had no questions about it, and that the words "my residence" appeared in two locations on the form at the time Defendant signed it, and in essence were not inserted later as Defendant claimed.

*After* Defendant executed the "Consent to Search" form, Defendant told King there was a gun over the lefthand cabinet of the refrigerator. Additionally, King searched the sister's bedroom and found $3,800 in the pocket of a black coat in the closet.

## Discussion

Defendant moves to suppress the firearm and marijuana found during the search of the apartment.[6] *See* Def.'s Motion, ECF No. 186. Defendant does not dispute that he signed the "Consent to Search Form," but he makes two primary arguments regarding the consent he gave: (1) his consent was not voluntary; and (2) to the extent his consent was voluntary, the officers exceeded its scope.

**I.     Voluntariness of Consent**

Defendant contends his consent was not voluntary and was coerced because officers knocked on the front door with their guns drawn and because he was handcuffed when he gave consent.

"The Fourth Amendment prohibits unreasonable searches, and searches conducted without a warrant are per se unreasonable unless a valid exception to the warrant requirement is applicable."

---

[6]     To the extent Defendant moves to suppress the cash seized during the search of the residence, the Court's following analysis would likewise apply to the seizure of the cash.

*United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "Voluntary consent to a search is such an exception." *Id.* A court must examine the totality of the circumstances to determine whether a defendant freely and voluntarily gave law enforcement consent to search. *Schneckloth*, 412 U.S. at 227. The government must prove by a preponderance of the evidence that the consent was voluntary. *United States v. Digiovanni*, 650 F.3d 498, 514 (4th Cir. 2011).

In examining the totality of the circumstances, appropriate factors to consider include the characteristics of the accused (such as his age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). *Lattimore*, 87 F.3d at 650. The critical inquiry is whether a defendant's consent to search was his own "'essentially free and unconstrained choice'" or whether his will was "'overborne and his capacity for self-determination critically impaired.'" *United States v. Watson*, 423 U.S. 411, 424 (1976) (quoting *Schneckloth*, 412 U.S. at 225). Although the government does not have to show the defendant knew of his right to refuse consent, whether the defendant knew of this right is a relevant factor in determining whether his provision of consent was voluntary. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001). "Written consent supports a finding that the consent was voluntary. Consent given while in custody may still be voluntary." *Id.* (internal citation omitted). "[N]either the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself." *United States v. Elie*, 111 F.3d 1135, 1145 (4th Cir. 1997) (internal quotation marks and alterations omitted), *abrogated on other grounds by United States v. Sterling*, 283 F.3d 216 (4th Cir. 2002).

The Court finds the Government has shown by a preponderance of the evidence that Defendant

7

gave his consent freely and voluntarily and was not coerced to do so, based upon a totality of the circumstances. Regarding the voluntariness of Defendant's consent, the Court finds Stebbins's and King's testimony credible and Defendant's testimony not credible. Defendant consented to the search not only verbally but also in writing. Defendant does not question the validity of his signature on either consent form. The written "Consent to Search" form—which Stebbins read aloud and Defendant admits he read and signed[7]—stated, "This written permission is being given by me to the above named persons freely and voluntarily without threats, promises, or coercion of any kind to have me consent to the search and/or sign this form." The form twice specified that Defendant could refuse to consent to the search and that he could withdraw his consent at any time. Moreover, Defendant understood the implications of this consent because, before he signed the form, Stebbins told him the officers were there to execute a federal arrest warrant involving a Jamaican lottery scam. Stebbins credibly testified Defendant did not have any difficulty understanding what he was saying, and no evidence showed Defendant was mentally deficient, incapacitated, or otherwise unable to exercise free choice. Here, the Court has had the benefit of observing Defendant's testimony and demeanor. No evidence in the record, whether age, maturity, education, intelligence, or experience, indicates Defendant was unable to make his decision freely and voluntarily.

Although Defendant was in handcuffs and in custody pursuant to an arrest warrant at the time he consented, examination of the totality of the circumstances does not support a conclusion that his consent was involuntary or coerced. *See Watson*, 423 U.S. at 424 ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."); *Boone*, 245

---

[7] Defendant contends the words "my residence" were *not* on the form at the time he signed it; this dispute relates to the *scope* of his consent, as discussed in Part II below.

F.3d at 362-63 & n.9 (concluding consent was voluntary "[a]lthough Boone was handcuffed during his interaction with law enforcement"). Significantly, Stebbins credibly testified that Defendant was initially handcuffed with his hands *behind* his back, but officers subsequently moved the handcuffs to the *front* of his body to ensure he was comfortable when seating him on the sofa to speak with them, at which time he consented to the officers' search of the residence and vehicle. Moreover, although five officers arrived at the apartment and knocked on the front door initially with weapons drawn, there is insufficient evidence that Defendant's consent was coerced as a result of these actions, that his will was "overborne," or that his capacity for self-determination was "critically impaired." *See Schneckloth*, 412 U.S. at 225. Stebbins credibly testified the officers served the arrest warrant at Defendant's apartment between 7:00 and 7:30 AM and waited three to four minutes for Defendant to open the door after they knocked. Furthermore, Stebbins credibly testified he interviewed Defendant for approximately fifteen to twenty minutes before asking him whether officers could search the residence and vehicle. The duration of time before the consent was relatively short. The conditions were not such that they would critically impair Defendant's capacity to refuse consent. Defendant was in his residence, on his couch, with handcuffs in front of his body. There is no evidence that the officers' weapons were drawn during the consent. Two to three officers were physically present when Defendant gave consent, and Defendant's testimony that officers threatened to lock his sister up is not credible or corroborated. In conclusion, the Court finds Defendant's consent to the search of the residence and the vehicle was freely and voluntarily given based upon a totality of the circumstances.

## II.    Scope of Consent

Defendant also argues that to the extent his consent was voluntary, the officers' search of the

9

residence exceeded the scope of his consent.[8]

When an individual gives police consent to search, he "may impose limits on the items or areas subject to the consent search, just as he may refuse to allow any search whatsoever in the absence of a warrant." *United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "[D]eterminations about the objective reasonableness of a search are made as of the time when the search takes place, based on the information available to officers *at that time*." *United States v. Coleman*, 588 F.3d 816, 819 (4th Cir. 2009).

Defendant argues he only consented to the search of his vehicle[9] and not to the search of his residence, and that officers exceeded the scope of the consent they were given by searching the apartment.[10] In making these arguments, Defendant relies on his testimony that the "Consent to Search" form that he signed did *not* initially include the phrase "my residence" and that officers added this

---

[8] To the extent Defendant challenges the officers' initial protective sweep of the entire apartment, the Court finds such a procedure was permissible given that officers were executing an arrest warrant inside the apartment. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) (holding the Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept may contain an individual posing a danger to those on the arrest scene).

[9] Defendant argues his consent to search his vehicle was coerced because officers threatened to arrest his sister if he did not agree to allow them to search the vehicle. This argument is moot because no evidence was found in the vehicle.

[10] Defendant argues the search of his sister's bedroom was an illegal search; the Government contends Defendant lacks standing to challenge this search. *See generally Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (stating a defendant has standing to object to a search and seizure if he can demonstrate a "legitimate expectation of privacy" in the place searched or the thing seized). The Court need not resolve this argument because, even if Defendant has standing to challenge the search of his sister's bedroom (an issue the Court does not decide), the Court finds the search was not improper, as explained herein.

phrase only after he signed the form and after they found the gun and marijuana. The Court finds Defendant's testimony not credible in this regard for several reasons. First, if Stebbins (who credibly testified he filled out the "Consent to Search" form and gave it to Defendant to sign) had originally written *only* "vehicle" and *not* included "my residence" on the form Defendant signed, there would have been an approximate three-inch blank space between the word "of" and the word "vehicle." Second, it is clear the word "my" modifies *both* the words "residence" *and* "vehicle." Third, although Defendant claimed he had no authority to consent to a search of the apartment, Defendant testified he stayed there with his sister.[11] Finally, and most importantly, Stebbins credibly testified it was not his practice to add things (words) to a consent to search form after a suspect executes it, and he testified he did not do so in this case; likewise, King credibly testified that the words "my residence" were on the form at the time Defendant signed it. Accordingly, the Court rejects Defendant's contention that the phrase "my residence" was added after he signed the form.

Additionally, Defendant argues the word "contraband" on the "Consent to Search" form is too vague and did not adequately specify the search was for a firearm or marijuana. The Court finds Stebbins's testimony is somewhat confusing as to whether "contraband" included a firearm or drugs. In any event, regardless of this uncertainty, the Court finds these items of evidence would inevitably have been discovered. Defendant does not dispute that at the time he signed the "Consent to Search" form, it included the phrase "evidence of lottery scam"; and, as discussed above, the Court has found based upon a totality of the circumstances that Defendant freely and voluntarily gave his consent. At

---

[11] *See, e.g.*, *United States v. Moore*, No. 5:14-CR-56, 2015 WL 93659, at *4 (W.D.N.C. Jan. 7, 2015) ("A warrantless search of a home is reasonable if conducted with valid consent of a resident. *Heien v. N. Carolina*, 135 S. Ct. 530, 536 (2014); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). "Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent." *United States v. Digiovanni*, 650 F.3d 498, 513 (4th Cir. 2011), *as amended* (Aug. 2, 2011). **It is clear that Defendant had authority to consent as a resident of the home.**" (emphasis added)).

11

the hearing, the Court asked Stebbins whether the gun and marijuana would have been located during the search for evidence of the lottery scam. Stebbins answered this question by credibly testifying the search for evidence of the lottery scam encompassed all the rooms of the house and necessarily included the areas where the gun and marijuana were found.[12] Because the evidence shows the gun and marijuana would inevitably have been discovered during the lawful and voluntarily-consented-to search of the residence for evidence of the lottery scam, the gun and marijuana are admissible at trial. *See Nix v. Williams*, 467 U.S. 431, 448 (1984) ("[W]hen, as here, the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."); *United States v. Hairston*, 409 F. App'x 668, 670 (4th Cir. 2011) ("Because the items seized would have been inevitably discovered, the district court was correct in denying Hairston's motion to suppress.").

## Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's motion to suppress [ECF No. 186].

**IT IS SO ORDERED.**

Florence, South Carolina  
August 25, 2016

s/ R. Bryan Harwell  
R. Bryan Harwell  
United States District Judge

---

[12] Significantly, Stebbins credibly testified the search of the entire apartment produced evidence of the identification of some victims of the lottery scam.